Filed 7/1/14  P. v. Grubb CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057441 |
| v. | (Super.Ct.No. BAF005730) |
| PAMELA JEAN GRUBB, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jeffrey J. Prevost, Judge.  Affirmed.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant, Pamela Grubb, of four counts of committing lewd and lascivious acts on a minor (Pen. Code, § 288, subd. (a))[1] and one count of penetration of a victim's genital opening with a foreign object (§ 289, subd. (d)).  The jury further found that defendant had committed offenses against more than one victim (§ 667.61, subd. (e)(5)).  She was sentenced to prison for four consecutive terms of 15 years to life, plus two years.  She appeals, claiming her numerous requests for evaluation of her ability to stand trial should have been granted, insufficient evidence supports her conviction of some of the offenses, evidence was improperly admitted and excluded and cumulative error resulted from the latter.  We reject her contentions and affirm.

## FACTS

Defendant's oldest daughter, the victim of two counts of lewd and lascivious conduct and the penetration charge, who was 22 at the time of trial, testified that when she was under the age of 13, defendant got angry with her when she refused defendant's request to play with defendant's sex toys (dildos and vibrators) with defendant and defendant punished her by placing them in herself or in the oldest daughter's mouth, or by hitting the daughter, throwing things or telling her to leave.  Defendant forced the daughter to clean the dildos defendant used with cleanser or soap and hot water.  Also when the oldest daughter was under the age of 13, defendant would have her massage her while defendant was naked, and defendant would moan in a sexual manner during such

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

massages and tell the daughter to rub lower, meaning near defendant's derriere. If the daughter refused the latter, defendant would get angry and tell the daughter to get out or defendant would hit her. During one such massage, defendant asked the daughter to insert a sex toy in defendant's vagina and when the daughter refused, defendant told her to get out. During another massage, defendant grabbed a sex toy and jammed it into the back of the oldest daughter's throat, while saying derogatory things to her. When this daughter was less than seven years old, defendant touched her vagina. When she was about 11, but before she turned 13, she was asleep in her bed when defendant entered her room and shoved a tampon into her vagina, then walked away, laughing. Defendant took the oldest daughter to sex shops and when the daughter was 9 years old, defendant bought her a chocolate penis. Defendant, who was married to her daughters' father, brought other men to the family home when her oldest daughter was five years old. If defendant was unable to please these men, they would come after the daughter.[2] They would touch and carress her, and at times, she would find them on top of her when she was asleep.[3] Sometimes, defendant would be in the daughter's room while this was going on.[4] On one occasion, the oldest daughter awoke in her bed to find one such man on top of her.

---

[2] This testimony was solicited by defense counsel.

[3] See footnote 2, *ante*, page 3.

[4] See footnote 2, *ante*, page 3.

Defendant encouraged her oldest daughter to be friendly with these men, assuring the daughter that the men were not going to hurt the daughter. Upon solicitation by defense counsel, the daughter described how defendant had gone from being normal, when the daughter was under five years old, to stopping interacting with her family, and increasingly staring into space or spontaneously laughing for no apparent reason, refusing to talk to anyone and saying that she thought people were trying to kill her. Under questioning by defense counsel, this daughter testified that episodes of bizarre behavior by defendant became increasingly worse over time, the police had to be called, defendant underwent emergency mental health placements and defendant was never normal after the daughter was five years old. Defense counsel had the daughter report that defendant believed, when this daughter was six years old, that John Walsh, of television fame, had fathered defendant's middle daughter and defendant wondered if he had also fathered the oldest daughter and got angry when the daughter denied this.

Defendant's youngest daughter, who was the victim of two of the lewd and lascivious counts, was 15 years old at the time of trial. She testified that defendant made her wash defendant's sex toys three to four times. When the youngest daughter was less than 10 years old, defendant took her and defendant's middle daughter into defendant's bedroom and one man held the two girls against the wall at knife point and made them watch while another man had sex with defendant. On another occasion, defendant took another man up on the roof of the family home and had sex with him there while the youngest and middle daughters watched television inside the home. When the youngest

4

daughter was about five years old, defendant put her mouth on the former's breasts. When the youngest daughter was about six, defendant touched her genitals over her clothing. When the daughter was five or six, defendant took her to a sex shop and bought her a chocolate penis. Upon questioning by defense counsel, the youngest daughter testified that as long as she could remember, defendant did weird things almost daily, like talking to the wall, talking to people who were not present, thinking that the wall was John Walsh and mentioning John Walsh.

Defendant's middle daughter was 17 years old at the time of trial. She testified that defendant acted strangely. Acts of physical abuse of her by defendant to which she testified will be described elsewhere in this opinion. She testified that defendant kept sex toys on her bed where she and her sisters could see them. She corroborated the youngest daughter's account of being forced to watch defendant having sex with another man while yet another man held her and her sister to the wall with a knife. Defense counsel had her testify that when she was five years old, defendant began acting abnormally, like sitting in a chair mumbling and laughing, and telling the daughters that John Walsh, and not their actual father, was their father.

Other evidence will be disclosed as it is relevant to the issues discussed.

## ISSUES AND DISCUSSION

1. *Competency Proceedings*

    a. *Defendant's September 11, 2012 Request to be Evaluated for Competency*

"Defendant was arrested on October 11, 2007 . . . .  On February 29, 2008, she was found incompetent to stand trial and she was ordered committed to Patton State Hospital on March 28, 2008. . . .  She was found competent to stand trial and criminal proceedings were reinstated on February 13, 2009. . . .  On October 13, 2009, she was found, for a second time, to be incompetent to stand trial.  Defendant was committed to Patton State Hospital a second time on November 10, 2009. . . .  On November 9, 2010, she was found competent to stand trial and criminal proceedings were reinstated for a second time. . . .  Defendant was found, for a third time, to be incompetent to stand trial on February 28, 2011." (*People v. Grubb*, E054411, filed 8/17/12, pp. 2-3)  On April 13, 2012, the judge determined, for a third time, that defendant's competency had been restored.  In her opening brief, defendant concedes that during this hearing, she agreed that she was competent to stand trial.

On September 10, 2012, while defendant was represented by an attorney who had recently been appointed to represent her,[5] she said she wanted to dismiss that lawyer, because defendant wanted to pursue an alibi defense, but her attorney concluded that this

---

    [5] At the beginning of trial, defense counsel represented to the trial court that she was defendant's seventh attorney.  However, the records before this court show that defendant was represented by five different Deputy Public Defenders, by herself, and by three different attorneys from a conflicts panel law firm.

6

would be an ineffective tactic and wanted to pursue something else. The court below noted that defendant had had disagreements with all her prior attorneys over trial tactics, but that the court declared this was a matter for counsel to determine and not defendant. The court said, "It's fairly clear to the Court that there's no one that would otherwise satisfy [defendant] . . . and . . . most of [defendant's prior attorneys] have actually asked to be relieved . . . and have not been willing to . . . stick it out . . . ." The court below denied defendant's request to have her attorney dismissed, finding that counsel's choice in trial tactics was more prudent than defendant's.[6]

On September 11, 2012, having already declared that she was ready for trial, counsel for defendant reported to the court below that defendant could not assist her, in a rational manner, in presenting her defense, therefore, she was declaring a doubt about defendant's competency pursuant to section 1368. This belief was based on a letter defendant had written on August, 14, 2012, in which she represented that things had happened that had not, which things defendant wanted counsel to present as part of her defense.[7] The prosecutor asserted that there had to be a finding of a change in

---

[6] Defendant's assertion that her attempt to dismiss her attorney somehow demonstrated that she was incompetent is meritless. If every defendant who brought a *Marsden* motion was evaluated for incompetency, the criminal justice system would grind to a halt.

[7] The court below concluded the defendant, "makes various statements in this letter which are incorrect at best, delusional, I guess, at worst with respect to things that are . . . communicated here that simply don't have any . . . basis that the Court can see in . . . any type of fact."

7

circumstances for section 1368 proceedings to once again commence. Defense counsel

pointed to defendant's letter, the fact that she was on antipsychotic medication in 2008

while at Patton State Hospital (Patton), but no longer was[8] and the fact that five months

had elapsed since that finding as the requisite change in circumstances or new evidence

that called into question the validity of the April 2012 competency finding.

After reviewing the reports of psychologists who had evaluated defendant in the

past, including for the April 2012 competency determination, the court below observed

that, according to those reports, defendant had a mental illness, most recently described

as schizophrenia,[9] but, nevertheless, was able to understand the proceedings against her.

Additionally, the court reported that the psychologists who had submitted reports for the

April 2012 determination differed as to whether defendant was able to cooperate

rationally with counsel. In fact, two of the psychologists who evaluated her concluded

that she was competent to stand trial, while the other two concluded otherwise. The court

observed that the judge who had determined in April 2012, that defendant was competent

to stand trial had read in the reports statements defendant had made during her interviews

by the psychologists that were bizarre[10] and, therefore, similar to the statements she made

---

[8] Defendant, herself, represented to the court below on September 7, 2012 that she was not taking any medication for her mental health.

[9] The same psychologist also opined defendant could have a delusional disorder.

[10] For example, she told one of the doctors who examined her on March 6, 2012 that she was a Navy Seal, that she was still, at that date, in the Army, that she had been

*[footnote continued on next page]*

8

in the August 14, 2012 letter. Due to this similarity, the court below concluded that the letter did not constitute "new evidence that called into question the validity of the competency finding," but, rather "more of the same." The court further observed that the judge who had concluded in April 2012, that defendant was competent had been aware that the psychologists believed she had a mental illness, but, nonetheless, was competent to stand trial. Finally, the court noted that one of the psychologists had reported that defendant had not been prescribed any psychiatric medications, although it was the latter's opinion that she could benefit from them.[11] Therefore, at the time of the April 2012 competency determination, defendant was not on medication, but was still found to be competent. The court below concluded that defendant had failed to meet her burden of showing a substantial change of circumstances or new evidence that called into question the validity of the April 2012 competency determination. However, the court did want to determine whether defendant could better assist her attorney by being put on medication, therefore it ordered defendant to be seen by a psychiatrist at the County Department of Mental Health to determine if medication was in order or if she had been returned to the jail from Patton with a prescription for medication. Following this ruling, defense counsel restated, for the record, her belief that defendant could not assist her in a

stationed at March Air Force Base and that she was twice married to John Walsh of television fame, once when she was 13 years old.

[11] Defendant had been taking medication while at Patton State Hospital, where she regained her competency.

9

rational way in her defense of defendant, therefore, counsel said that she was proceeding to trial without defendant's assistance. Counsel asserted that under section 1368, the court had an obligation, "at minimum" to have defendant evaluated by one doctor "to make sure that she is competent" before trial began. The court noted that the concern defendant's present counsel had, about her and defendant disagreeing about trial tactics and defendant possibly sabotaging counsel's tactics, "is what ultimately caused the conflict [between defendant and three of her prior attorneys, all of whom were removed from representing her]" therefore this conflict was "nothing new." The court added that "while I may have reviewed [the reports of the psychologists] differently than [the j]udge [who determined in April, 2012 that defendant was competent], I . . . can't substitute my opinion for his when there's nothing new that I see from this [August 14, 2012] letter that was contrary to what was already . . . noted in the reports [of the psychologists]." The court noted that around the same time defendant was saying bizarre things, she also "has been responsive to the Court . . . [and] has obviously behaved in an appropriate fashion . . . ." The following day, the case was assigned out to the trial court for trial, and hearings on 402 motions and motions in limine and voir dire took place.

Defendant concedes that a court need not suspend proceedings and conduct a competency hearing, subsequent to a competency determination having been made, unless it "is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding." (*People v. Zatko* [(1978)] 80 Cal.App.3d [534,] 548; *People v. Kaplan* (2007) 149 Cal.App.4th 372 [(*Kaplan*)]; and

10

*People v. Melissakis* [(1976)] 56 Cal.App.3d [52,] 62 [(*Melissakis*)].) The trial court may appropriately take its personal observations into account to determine whether there has been some significant change in the defendant's mental state. (*People v. Jones* (1991) 53 Cal.3d 1115, 1153.) However, defendant asserts that the court below "should have ordered a doctor to evaluate [defendant] to determine if there had been any change in circumstance or any new evidence that showed [defendant's] mental state had decompensated since" the April 2012 determination that she was competent.[12] She asserts that the court below had such an obligation based on "defense counsel's adamant pleas . . . that [defendant] was unable to assist in her defense, couple with the [psycholgists'] evaluations [for the April 2012 competency determination], two of which stated she was not competent, and one of which indicated [defendant's] mental state was fluid and that her symptoms could likely increase in severity over time, and the fact that [defendant] had been found incompetent on three prior occasions." However, defendant did not assert any but one of these bases below, arguing, instead, that she had shown a change in circumstances and new evidence undermining the prior competency finding based on the August 2012 letter. Additionally, defendant, cites no authority to support

_____

   **12** In her reply brief, she expands this to include the court below "further inquir[ing] into [defendant's] mental state and afford[ing defendant] the opportunity to present the necessary evidence that would show that a second competency hearing was warranted." The proceedings we have outlined above were extensive. The court below took great care and time to listen to whatever defense counsel had to say about defendant's mental state. The court conducted a thorough inquiry into defendant's then present mental state and gave defense counsel every opportunity to present whatever evidence she had.

11

her position that the court below had an obligation to order this hybrid, not-quite-a-section-1368 proceeding. The authority she does cite does not support it.

In *Kaplan, supra,* 149 Cal.App.4th 372, the defendant had been found competent to stand trial nine months before trial began. (*Id*. at p. 375.) At the beginning of trial, defendant jumped from the second tier of the jail, defense counsel expressed a doubt about the defendant's competency and the court appointed a psychiatrist and a psychologist, who had previously evaluated the defendant, to examine him once again. (*Id*. at pp. 378-379.) The psychologist reported that defendant's psychotropic medications had been changed within the two weeks before trial began and, as a result of that change, defendant's mental condition had decompensated. (*Id*. at pp. 376, 379.) The psychologist's report "showed [that] defendant was unable to assist counsel in conducting the defense." (*Id*. at pp. 376, 379-380.) The psychiatrist reached a contrary conclusion. (*Id*. at pp. 379-380.) Relying on the holding of *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1047, that " the substantial evidence standard 'is satisfied if at least one expert . . . [opines that] the accused is incapable of understanding the proceedings or assisting in his defense[,]'" (*Kaplan,* at p. 385) the appellate court concluded that the psychologist's report constituted "substantial evidence showing . . . a substantial change in circumstances since the trial court's earlier finding of competency that gave rise to serious doubt about defendant's competency . . . . [T]herefore[,] . . . [t]he trial court . . . should have conducted a second competency hearing." (*Kaplan*, at p. 387.)

This was despite the existence of contrary evidence, i.e., the psychiatrist's opinion or the trial court's own observations. (*Id*. at pp. 384, 386.)

Here, in contrast to *Kaplan*, there was no opinion by an expert that there was a substantial change in circumstances since defendant's April 2012 competency determination that gave rise to serious doubt about the continuing validity of that determination. There was only the August 2012 letter and defense counsel's assertion that defendant was unable to cooperate with her in mounting a defense. *Kaplan* cannot be relied upon as support for defendant's position that such evidence constitutes substantial evidence of the requisite change in circumstances or new evidence. Moreover, *Kaplan* involved a regular section 1368 competency proceeding—not the hybrid "lets-have-one-more-doctor-examine-defendant-to-make-sure-she's-still-competent" proceeding that defendant proposed below and here. Defendant cites NO authority for such a proceeding. Moreover, if this proposed doctor concluded that defendant was competent to stand trial, would defense counsel have then asked for a second opinion? And, if so, would the proceedings not then morph into a full-blown section 1368 proceeding, which, of course, would require a demonstration of change of circumstances or new evidence that undermined the April 2012 competency finding? Additionally, what would become of defendant's insistence on not waiving time for trial, which was due to begin the following day?

The fact, as defendant points out, that there was a difference of opinion amongst the psychologists who evaluated defendant for her April 2012 competency determination

13

does nothing to warrant a finding of substantial evidence to mandate proceedings under section 1368 or even defendant's proposed hybrid procedure. Their examinations of defendant dated from August, September, October and December 2011 and March 2012, which *predated* the competency determination. Their reports could not possibly contain information that would constitute substantial evidence of a change in circumstances or new evidence that would undermine the subsequent competency determination.

Finally, defendant calls our attention to the words of the court below that "while I may have reviewed the . . . reports of the psychologists differently that [the j]udge [who determined in April, 2012 that defendant was competent], I . . . can't substitute my opinion for his when there's nothing new that I see from th[e August 14, 2012] letter that was contrary to what was already . . . noted in the reports [of the psychologists]." The fact that the court below may have made a determination of defendant's competency in April 2012, different from that of the judge who did, in the face of the conflicting opinions of the four psychologists who examined defendant, has nothing whatsoever to do with whether there was substantial evidence five months later of a change of circumstances or new evidence calling that determination into question.

14

b. *Defendant's Subsequent Requests to be Evaluated for Competency/Subsequent Developments*[13]

Day number one of trial began with defense counsel reporting to the trial court that defendant had sustained a laceration to her upper lip and she had become combative. Counsel expressed concern for her own safety, although she noted that defendant appeared to be calm, and she said she did not know how they were going to proceed as things then stood and she believed defendant needed to be medicated. Defendant reported that a sheriff's deputy had pushed her, after she had been pushed the day before, and she told him not to and pushed him back, then she was taken down. Defendant complained that she was not being given insulin as she was supposed to and the trial court ordered that that be done. Defendant told the trial court that she felt able to go forward and proceedings resumed.

On day number two of trial (Sept. 17, 2012), defense counsel reported that defendant had not yet been seen by a psychiatrist from County Mental Health as the court below had ordered. Counsel reiterated her belief that defendant needed to be put on medication. Counsel reported that in September 2008, Patton had requested that defendant be involuntarily medicated, but defendant had received no medication since

---

[13] To the extent defendant asserts that during none of this subsequent period did she request proceedings under section 1368, but, rather "a psychological evaluation to determine whether another competency hearing was warranted" and "defense counsel was not asking for a second competency hearing", the record belies her claim, as we demonstrate in the text of this opinion, and, as we have already stated, there is *no precedent* for a trial court ordering such an evaluation.

15

being released from Patton because no one had requested an order and defendant had refused to take medication voluntarily. Counsel also reported that defendant gave a statement to a police officer pretrial, but on a date not specified, that was "unreal," meaning that defendant was delusional during it. Counsel further asserted that defendant was unable to assist in her defense in that the only thing she said about jury selection was that she did not want one particular potential juror on the panel because that person "look[ed] mean." Counsel also reported that defendant wanted a restraining order against the deputy, presumably, that gave her the fat lip, and against counsel, herself. Defendant told the trial court that she was requesting a restraining order against her own attorney for harassment because the latter wanted to change defendant's plea from not guilty to not guilty by reason of insanity and counsel said that defendant had said that she was guilty but defendant did not say that. Defendant added that her attorney "keeps pursuing this incompetency plea, but I'm not incompetent . . . ." Defense counsel told the trial court that she never asked defendant to plead guilty and she did not believe her to be guilty. The prosecutor pointed out that defendant understood that Patton had treated her for as long as it could, and if defendant was sent back to Patton, Patton would release her under a conservatorship.[14] The prosecutor pointed out that defendant was insisting that she was competent while her attorney was insisting that she was not, therefore, he could

---

[14] Apparently, the prosecutor did not read our opinion in *People v. Grubb*, E054411, filed August 17, 2012.

16

understand why the defendant was frustrated with her attorney. The trial court declined to institute proceedings under section 1368,[15] finding that it did not entertain a doubt about defendant's ability to understand the nature of the proceedings against her and to cooperate with counsel. The court noted that it had reviewed the latest reports of three of the psychologists concerning her ability to cooperate and there was a difference of opinion between defendant and her attorney over trial tactics, but that counsel could proceed with her choice of tactics and could secure defendant's cooperation in trying the case. The trial court further found that defendant had not presented a basis upon which the court could issue a restraining order against her attorney—that defendant's request for one was the product of a disagreement over trial tactics. The trial court stated it accepted at face value counsel's representation that she had never suggested to defendant that the latter plead not guilty by reason of insanity and defendant's belief otherwise was due to confusion on defendant's part. Counsel responded that it was not due to confusion—it was due to the fact that defendant's "sense of reality is not there. She believes we do things or something happens that is not actually happening." The trial court reiterated its finding that it did not have a doubt about defendant's competency. The trial court added, "Based upon [the] . . . previous findings [by the judge on April 13, 2012], I'll find that

---

[15] Defense counsel asked the trial court "whether [she] needed to again re-request the [section] 1368, but [she] probably should" and the trial court told her that it took her request as an indirect request for a section 1368 finding.

17

the defendant may proceed in this matter with an understanding of the nature of the proceedings and is capable of assisting counsel in the defense of this matter."

Defendant asserts that in so ruling, the trial court "relied on [the judge's April 13, 2012] ruling that [defendant's] competency had been restored." However, the record does not support this assertion. The trial court made its own determination that defendant was competent to stand trial. The fact that defendant may have been suffering delusions did not render the trial court's finding an abuse of discretion. (*People v. Ramos* (2004) 34 Cal.4th 494, 507.) Nor did the fact that she wanted a potential juror not chosen for the jury because that person "looked mean." Some defense attorneys employ high-price jury consultants to tell them the same thing.

On day number three of trial, defense counsel reported that a psychiatrist had seen defendant the day before and determined that she would benefit from taking medication, but the county department of mental health could not provide it until it obtained records from Patton. Counsel said that an additional issue was that defendant would not voluntarily take medication. The trial court observed that without the records from Patton, it could not make any further orders. At that point, defense counsel renewed her request for a competency hearing and said she had records from Patton that she would share with the trial court and the psychiatrist. The trial court stated that an offer of medication had been made to defendant, but she refused, and the court felt it could not go further in ordering her to take the medication. As to the request to proceed under section 1368, the trial court said, "I'm going to stand by the Court's previous order made . . . on

18

[September 17, 2012], that at this time I do not entertain a doubt with respect to defendant's competency to stand trial . . . , and I based that upon [the judge's April 2012] findings." Because nothing had changed in the two days that had elapsed since the trial court's previous finding, we reject defendant's contention that the trial court abused its discretion in finding that it had no doubt as to defendant's competency to stand trial.

Later the same day, when defendant's middle daughter was called to the stand to testify for the prosecution, defense counsel said that defendant was requesting fingerprints and a DNA test because she did not believe that the girl was her middle daughter. The trial court denied the request. At the end of this day, defense counsel reported that defendant had told her that the deputy sheriff downstairs in the courthouse was harassing defendant on purpose due to the nature of the charges against her, and she was claiming that her wrist was hurt that morning, blood was currently coming out of her knee and her restraining order paperwork had been confiscated. Defendant explained that the restraining order paperwork was for an order against the deputy. The trial court said it would order defendant to be seen by at least a nurse within six hours and it ordered that defendant be transported by the use of no greater force than is necessary and that she be treated with dignity. Counsel reported that defendant said that the deputy told her that if she steps to one side, it means she wants to go to jail and if she steps to the other side, it means she does not. Therefore, defendant is afraid to step in the direction of going to jail. Although counsel said that the foregoing was part of "an issue . . . going back to the same issue that we've been having" she did not declare a doubt as to defendant's competency,

19

at this point or earlier when defendant questioned the identity of her daughter and counsel did not ask the trial court to institute proceedings under section 1368. As the trial court previously found as to other evidence, this was not new evidence calling into question the prior finding of competency.

During a *Marsden*[16] hearing four days later,[17] defendant asserted that certain facts would provide her with an alibi and her attorney insisted that these facts did not exist. After the trial court denied defendant's request to replace her attorney, finding that the difference of opinion between them was a matter of trial tactics, which defense counsel controlled, the latter again renewed her request for section 1368 proceedings, citing defendant's "[in]accurate . . . sense of reality." The trial court asked that the prosecutor be brought back into the courtroom and when he was, defense counsel dropped the matter. Again, this was not new evidence calling into question the former finding of competency. We do not agree with defendant's suggestion that the mere fact that she brought a *Marsden* motion, even her second one against this particular attorney, was grounds for the initiation of proceedings under section 1368.

---

[16] *People v. Marsden* (1970) 2 Cal.3d 118.

[17] Although appellate counsel for defendant refers to this hearing in his brief, suggesting that he must have read it, he inexplicitly failed to notify this court that it had been mistakenly included in the (non-confidential) Reporters Transcript, and, thus, was available to anyone who wanted to read it, in violation of defendant's attorney/client confidentiality.

20

The same day, defendant testified in her own behalf.  For the most part, defendant answered all questions asked of her coherently.  Defense counsel was able, during her direct examination of defendant, to get defendant to present the defense, which was that defendant was falsely accused of sexually abusing two of her daughters in order to get her removed from the family home so her ex-husband could get it and custody of the couple's three daughters in their dissolution proceedings.  Defendant denied engaging in any of the sexual acts her three daughters testified she had committed.  However, defendant also said that her ex-husband had wanted to kill their oldest daughter for insurance money when the latter was 10 months old.  She also said that her ex-husband had dislocated this child's arm.  She said that a child "had been born" between her first and second daughters, but she never claimed that this child was hers and she put it up for adoption.  She denied that she had been diagnosed with or having schizophrenia, but claimed it was post traumatic stress disorder, and she was presently cured through therapy.  She claimed not to recall being diagnosed, while in Patton, with borderline personality disorder and she said Patton found that she did not have a delusional disorder. When shown records from Patton stating that she had been diagnosed with a delusional disorder and borderline personality disorder, she claimed that this was an incorrect statement.  She denied that she was in a mental institution before this case was filed in 2007, but said she had been in one in the early 1990s.  Later, she added that she had been in Patton for a few years since she was incarcerated in this case.  She denied being forced to take medication while in Patton.  She contested the accuracy of some of the paperwork

21

related to her divorce from her former husband. She also said she doubted that the girls who claimed in court to be her youngest and middle daughters were actually hers, saying it was possible these people could have been substituted for her actual youngest and middle daughters. She also repeated what she had said before during her examination by the psychologist—that her middle daughter was the child of John Walsh of television fame and that she was a test tube baby. She denied slashing her cellmate's arm, although she admitted that she had another case pending against her.

After the jury convicted defendant, defense counsel again requested that proceedings under section 1368 begin due to what defendant had said during her testimony. The trial court denied the request, finding that it did not "entertain a doubt with respect to the ability of the defendant to comprehend the nature of the proceedings and to assist counsel." The trial court then appointed a psychologist to evaluate defendant under the authority of section 288.1.[18]

The psychologist reported facts and opinions that were not new—that defendant was delusional, schizophrenic and in need of medication to decrease the intensity of her delusions and improve her thinking process. He concluded that her denial of any

---

[18] That section prohibits the suspending of the sentence of a defendant convicted of committing lewd and lascivious acts on a minor until the court obtains a report from a psychiatrist or psychologist as to the mental condition of that defendant.

Although it was not anticipated that defendant would receive probation, defense counsel requested the report "to see where, if anywhere, [defendant] should be placed." Defense counsel anticipated that the psychologist would recommend a specific institution at which defendant should be placed, however, the expert concluded only that defendant should be "psychiatrically treated (e.g.[,] medications) in a psychiatric hospital.

22

wrongdoing in regard to these crimes was "a primitive, naïve delusional denial, typical of people who are mentally ill and are in the midst of their psychosis." He predicted that defendant would eventually end up in a psychiatric hospital as a Mentally Disordered Offender or a Sexually Violent Predator at the time she was became eligible for parole.

At the beginning of the sentencing hearing, defense counsel made her final request for proceedings under section 1368. Although she said she was basing the request on the probation report, she made no reference to any specific part of it, rather, referring to some of the matters stated by the psychologist in the section 288.1 report mentioned above. She repeated that defendant did not assist her in her defense of her and, in fact, contradicted facts counsel tried to bring out on direct examination of defendant that would have assisted defense counsel in what she was attempting to assert. The trial court, for the last time, denied counsel's request, saying, "I still find that pursuant to the finding of [the judge who found defendant competent in April 2012], that I do not entertain a doubt at this time with respect to defendant's either understanding of the proceedings or ability to assist counsel in the preparation of her defense . . . ." It is noteworthy that this psychologist did not opine that defendant was incompetent to be sentenced. Absent this, the only new information was the psychologist's opinion that defendant should be placed in a psychiatric hospital. Defendant cites no authority holding that this fact, alone, compels the initiation of section 1368 proceedings.

Defendant cites in support of her position that her request to proceed under section 1348 should have been granted *Melissakis, supra,* 56 Cal.App.3d 52. In *Melissakis*, two

23

psychiatrists, who had opined during two pretrial section 1368 competency hearings that

defendant had no psychiatric disease, recanted these opinions during the sanity phase of

the trial. (*Id*. at pp. 55-56, 59.) Additionally, the appellate court concluded that what

occurred during trial gave "validity to [the] opinion" of the third psychiatrist, who had

concluded pretrial that defendant was incompetent, and there was a "material change of

circumstances" that casted doubt on the validity of the pretrial determination of

competency. (*Id*. at pp. 61-62.)[19] The appellate court concluded that in light of this, the

trial court should have made further inquiry into defendant's competence. (*Ibid*.) The

facts of *Melissakis* are distinguishable from those here in that there was no recantation by

the two psychologists who originally concluded that defendant was competent to stand

trial as to any opinions they had reached. Moreover, we have not concluded, as did the

appellate court in *Melissakis*, that there was a material change in circumstances that

casted doubt on the validity of the competency determination.

2. *Insufficiency of the Evidence*

The youngest daughter testified that defendant "rub[bed] her hand around" on her

genitals over her clothes when the daughter was about six years old. She also testified

---

[19] The dissent in *Melissakis* wisely points out that the majority's conclusion "involves a determination by th[e appellate ]court that [defendant's] testimony is sufficient *as a matter of law* to require that the trial judge should have entertained a doubt as to defendant's present [competence] and ordered a full hearing. *No other case has purported to hold that such a slim showing constitutes, as a matter of law, substantial evidence requiring the trial judge to declare a doubt.*" (*Melissakis*, *supra*, 56 Cal.App.3d at p. 63 (dis. opn. of Brown, G.A., italics added).) Indeed, neither has any case in the 28 years since *Melissakis* was decided.

that when she was about five years old, defendant put her mouth on the daughter's breasts. The prosecution relied on these two incidents to urge the jury to convict defendant of the charged counts of committing lewd and lascivious acts on the youngest daughter. Defendant here contends that there was insufficient evidence that she committed this touching with the intent of arousing, appealing to or gratifying the sexual desires of herself or of her daughter. We disagree.

As already stated, the youngest daughter also testified that defendant forced her to wash defendant's plastic penis and vibrator three to four times. When this daughter was five or six years old, defendant took her to a sex shop and bought her a chocolate penis. When this daughter was less than 10 years old, defendant took her and her middle daughter into her bedroom, where a man held the girls to the wall at knife point and defendant made her daughters watch as she had intercourse with a second man who was in the room. Another time, defendant took a man up on the roof and had sex with him while this daughter and her sister watched television. This, combined with evidence of acts of a sexual nature defendant had engaged in with her oldest daughter, was more than sufficient evidence that defendant acted with the requisite intent when she rubbed the youngest daughter's genitals and put her mouth on her breasts. While it is true that a mother could have a non-sexual reason for touching her daughter's genitals[20] or putting

---

[20] We, however, doubt, as defendant now asserts, that she may have been checking the six year old to see if she was wet. Most six year olds are *well* past potty training.

her mouth on her breasts, the jury was free to adopt the reasonable inference, in light of the other acts defendant engaged in with this daughter and her older daughter, that these touchings were done with the requisite intent. *People v. Mansell* (1964) 227 Cal.App.2d 842, upon which defendant relies, is inapposite as it involved a one-time, arguably accidental touching with no evidence of other contact of a sexual nature. Additionally, we were much more aware of the dangers of inappropriately touching children when these crimes occurred than we were in 1962, when the act in *Mansell* occurred.

3. *Admission of Evidence*

The first mention of bad acts perpetrated by defendant against the victims came during the youngest daughter's direct testimony, when she testified, without objection from defense counsel, that bad things had been done to her by her mother.[21] When asked by the prosecutor if she had to describe what bad things were done to her on a scale from one to ten, what she would say, defense counsel objected only on the basis of the prosecutor's use of the word, "bad," "under Evidence Code 352[.]" The trial court sustained the objection and the prosecutor asked the youngest daughter to think about the

---

[21] Before trial began, defense counsel requested that she be allowed to introduce reports from Child Protective Services (CPS) concerning allegations of sexual, physical and emotional abuse perpetrated by defendant against her daughters. Counsel also said she intended to call as a witness a defense investigator, who "interviewed [defendant's daughters]. In th[e] reports [of their interviews], the [daughters] don't mention any sexual acts, only physical abuse . . . ." Therefore, defense counsel must have anticipated, when defendant's youngest daughter was asked if any bad things had been done to her by her mother, that the youngest daughter might well testify to acts of physical abuse by defendant.

26

first time in her recollection bad things had happened to her. Again, defense counsel objected, on the same basis, but this time the trial court overruled the objection and the youngest daughter testified to an incident of physical abuse by defendant. We do not consider counsel's objection, solely on the basis of the prosecutor's use of the word, "bad," as preserving defendant's current objection that the evidence was inadmissible under Evidence Code section 1101, subdivision (b)[22] or Evidence Code section 352,[23] that its admission violated defendant's right to a fair trial or that it was not admissible under Evidence Code sections 1108 or 1109.[24]

---

[22] That subdivision permits the admission of evidence of prior acts to show common plan, identity of the perpetrator, preparation, knowledge, or absence of mistake or accident.

[23] That section prohibits the admission of evidence that is more prejudicial than probative.

[24] Evidence Code section 1108 permits the admission of evidence of other sexual offenses perpetrated by the defendant as demonstrating the defendant's propensity to engage in such conduct with the victim. Evidence Code section 1109 permits the admission of evidence of other acts of domestic violence perpetrated by the defendant as demonstrating the defendant's propensity to engage in such conduct with the victim.

Because defendant here contests the admission of evidence of acts that do not constitute sexual offenses, Evidence Code section 1108 does not apply.

Because defendant had not been charged with acts of domestic violence (Evid. Code, § 1109, subd. (d)(3); § 13700, subd. (b); Fam. Code, § 6211) we disagree with the People that it was admitted under that section. The People cite no authority holding that the acts involving the youngest daughter (see discussion, *infra*) and defendant's touching of the oldest daughter's vagina and having her rub defendant's back and asking her to insert a dildo into defendant's vagina constituted the "willful infliction of cruel or inhuman corporal punishment or an injury resulting in a traumatic condition" (§ 273d) required by Evidence Code section 1109, subdivision (d)(2). Moreover, the trial court did not expressly admit this evidence under that section, nor does the record before this court demonstrate that the People followed the procedural prerequisites of Evidence Code

*[footnote continued on next page]*

Defense counsel did not object when the prosecutor immediately thereafter asked the youngest daughter if there was "other stuff" besides the "physical stuff" that defendant did to her that hurt her. The youngest daughter replied that defendant didn't pay as much attention to her as the former would have liked. She went on to testify, without objection from defense counsel, that defendant engaged in acts of physical, emotional and sexual abuse of her. The daughter testified, again, without objection, to other acts of emotional abuse, i.e., defendant saying hurtful things to the daughter and having conversations with the wall while not having them with the daughter, which hurt the daughter's feelings. The prosecutor asked her, again without objection, if there were other incidents involving physical abuse and she related an incident during which defendant tried unsuccessfully to hit her with a broom, but then beat the middle daughter with it. Finally, when asked about any other incidents of physical abuse the youngest daughter remembered, defense counsel objected on the basis of relevance and Evidence Code section 352. However, by then, her testimony about the other two incidents of physical abuse and about the emotional abuse had already come in. The prosecutor asserted that the evidence was admissible under Evidence Code sections 1108 and 1109 and the trial court overruled the objection.[25] While defendant's point that any further objection on the basis of relevancy and 352 would have been pointless as to testimony by

section 1109, subdivision (b). Additionally, the jury was not instructed that it could use this evidence as Evidence Code section 1109 provides.

[25] See footnote 24, *ante*, pages 27-28.

28

the middle and oldest daughters concerning physical or emotional abuse, the same cannot be said of the youngest daughter's testimony on these two subjects.[26] By then, the "cat was out of the bag."

The middle daughter testified to two incidents of physical abuse by defendant, and she corroborated the younger daughter's account of the first incident of physical abuse involving the latter.

The oldest daughter testified that defendant would hit her when she was under the age of 13 and she corroborated the existence of one of the incidents of physical abuse by defendant involving the middle daughter, adding that she, too, was a victim in this incident. She also reported incidents of physical abuse and emotional abuse, but they were in retaliation for the oldest daughter's refusal to play with defendant's sex toys with defendant. The oldest daughter testified that she feared defendant and that fear caused her to submit to one of the sexual acts defendant perpetrated on her. She also testified that her fear of defendant doing something to her or killing her and her sisters prevented her from telling her father what was going on. Therefore, her testimony about the physical abuse defendant inflicted on her was relevant.

In her effort to bolster the defense, defense counsel elicited from the oldest daughter the fact that as part of the divorce proceedings between defendant and the

---

[26] Following defense counsel's objections on relevancy and Evidence Code section 352, the youngest daughter did not further testify about acts of physical or emotional abuse, the latter that were not sexual in nature.

daughter's father in 2005, the daughter had submitted a declaration in which she reported that defendant had not given her any food and that defendant had forgotten her own birthday, which hurt the daughter's feelings. The oldest daughter had also said in the declaration that she was afraid of defendant "'only because she only wants us for food stamps.'" The daughter explained that she had not mentioned the sexual incidents in this declaration because she was afraid that if she had, "something very, very bad would happen." Therefore, the defense, itself, introduced the idea that the oldest daughter was afraid of defendant and had been emotionally abused by her as part of its trial strategy. Indeed, during argument to the jury, defense counsel asserted that defendant was "not well" and, therefore, the jury should "question" what she had said on the stand. At two separate points, counsel referred to defendant as a "mentally ill person." Seeming to concede that the incident involving defendant jamming a tampon into the oldest daughter's vagina actually occurred, counsel also argued that "that's just plain crazy," however, there was no evidence that defendant did it to sexually arouse herself. Counsel went on to argue that defendant wasn't "fine," "hasn't been for years" and there was reasonable doubt that she had the necessary mental state for the charged offenses. In fact, counsel said, "*I do believe that there was physical abuse here. There was. The [daughters] rela[ted] that the[y] were hit, that they were beaten.* The question is, was there sexual abuse."

Given the above and the fact that the incidents involving the sexual abuse of the youngest and oldest daughters, *some of it solicited by defense counsel*, were so

30

*horrendous to be almost unthinkable*, we cannot agree with defendant that even if the trial court erred in admitting some of the evidence of physical and emotional abuse, i.e., that portion actually objected to on the bases claimed here and not corroborated by the admission of evidence solicited by the defense, itself, there is no reasonable probability that had it not been admitted, defendant would have enjoyed a better outcome. (See *People v. Watson* (1956) 46 Cal.2d 818.) For a similar reason, we also reject defendant's assertion that her trial attorney's failure to object to this evidence on these bases before she did constitutes incompetency of counsel requiring reversal of her convictions. (See *Strickland v. Washington* (1984) 466 U.S. 668, 694.)

4. *Exclusion of Evidence*

Before trial began, defense counsel told the trial court that she had given some reports from CPS to the prosecutor. She represented that these reports stated that CPS had investigated the allegations against defendant, including speaking to defendant's daughters, and had concluded that the only abuse that had taken place had been emotional and allegations of physical abuse had not been substantiated. Counsel requested that these reports be admitted and she added that she had subpoenaed the "intake specialist at CPS." The trial court responded that it was premature to request admission of the reports until they were proffered. A short time later, the prosecutor voiced his objection to the admission of the conclusion of "some other fact-finder[.]" The trial court said it believed that the opinion of a CPS worker that an allegation of abuse was unfounded is inadmissible opinion evidence unless defense counsel could convince the court

31

otherwise. Defense counsel likened the CPS worker's conclusion to that of a doctor who determines that there is no physical abuse because there are no bruises or scars or that an alleged victim of sexual abuse had not been abused because there was no damage to her hymen. The trial court disagreed with defense counsel that the conclusion of the CPS worker was analogous to a doctor's conclusion about the absence of physical injury. The court concluded, "[O]pining on the ultimate issue is . . . not one that is appropriate." However, the court added, if the CPS worker's conclusion was based on a lack of evidence of sexual abuse or if the youngest and/or oldest daughters disclaimed the allegations, causing the worker to find them to be unfounded, that evidence would be admissible. Defendant here claims that the trial court abused its discretion in denying admission of this evidence. We disagree.

Defendant cites a case, *Summers v. A.L. Gilbert* Co. (1999) 69 Cal.App.4th 1155, 1183, in which the appellate court held, "Expert opinions which invade the province of the jury are not excluded because they embrace an ultimate issue, but because they are not helpful (or perhaps too helpful) . . . . In other words, when an expert's opinion amounts to nothing more than an expression of his or her belief on how a case should be decided, it does not aid the jurors, it *supplants* them."[27] Defendant then attempts to

---

[27] As the People correctly point out, in *People v. Bejarano* (2009) 180 Cal.App.4th 583, 588, this court ruled that the opinion of a psychologist that defendant's disability prevented him from acting willfully or purposefully in failing to register as a sex offender was inadmissible because it invaded the province of the jury.

distinguish what the CPS worker's proposed testimony would have been from what *Summers* addressed.**28**  She does so with a complete lack of persuasion.  Introducing the CPS worker's opinion that the allegations of sexual abuse were not substantiated was precisely the kind of evidence with which *Summers* concerned itself.  The CPS worker's opinion that the oldest and youngest daughters were lying about defendant's sexual abuse of them would have been no more admissible than the opinion of any other witness that another witness was lying about what he or she says.**29**  It was inadmissible, as the trial court concluded.  Contrary to defendant's assertion, the fact that the CPS worker makes such determinations for a living does not make her opinion admissible—one only has to be aware of all the deaths of children who are returned to their parents by CPS workers,

---

**28**  Defendant cites *no* authority holding that such evidence is admissible.

**29**  Defendant appears to be talking out of both sides of her mouth in regard to the use of this evidence to imply that the victims are lying about the charges.  In her opening brief, she states, "Defense counsel's theory of the case was that [defendant's] daughters *fabricated the allegations* of sexual abuse. . . .  *To support this theory*, defense counsel wanted to introduce [the evidence at issue]. . . .  [¶]  . . . The evidence was highly relevant as it spoke directly to *the credibility of the victims' claims* that [defendant] sexually abused them."  "[T]he evidence went to the heart of the case, *whether the victims were telling the truth about* the sexual allegations.  The CPS worker's opinion would have strongly supported [defendant's] argument that [her] daughters *fabricated the sexual abuse* allegations . . . ."  "[The CPS worker's] opinion . . . would aid [the jury] in *assessing the credibility* of the girls' testimony . . . ."  However, in her reply brief, defendant asserts, "[the CPS worker's] opinion did not tell the jury that the girls' [*sic*] were lying about the abuse . . . ."  More importantly, because the trial court ruled that if the victims told the CPS worker that some or all of the acts of sexual abuse to which they testified did not occur, *this could be introduced into evidence*, the only thing that the trial court excluded of the worker's disputed testimony was that the victims told her the same story they told at trial, but the worker concluded that they were lying.

33

making similar conclusions that the children are safe, only to be killed by those parents, to know that a CPS worker is no expert in determining whether allegations of abuse are true or not. CPS does the best it can under the circumstances, which is all that it can do—it is not an infallible or even reliable source of opinion on whether these victims were sexually abused.

5. *Cumulative Error*

Having concluded that there was no reversible error in the trial court admitting the evidence of defendant's physical abuse of her daughters to the extent it was properly objected to by defendant below and the trial court did not err in refusing to admit the opinion of the CPS worker, we necessarily conclude that there was no cumulative error requiring reversal.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

HOLLENHORST
J.

KING
J.

34